2010 Ark. App. 766

Glenda FLYNN, Appellant

v.

SOUTHWEST CATERING CO. and Phoenix Insurance Co., Appellees.

No. CA 10–44.

Court of Appeals of Arkansas.

Nov. 10, 2010.

Shannon Muse Carroll, Lane, Muse, Arman & Pullen, Hot Springs, for appellant.

Phillip Parks Cuffman, Little Rock, for appellees.

WAYMOND M. BROWN, Judge.

<sub>|1</sub>This case returns to us after remand.[1] Flynn appeals the December 4, 2009 order of the Arkansas Workers' Compensation Commission (Commission) finding that she did not suffer a compensable injury to her neck and arms on December 16, 2006, and denying her temporary-total-disability benefits for her compensable right-foot injury beyond June 17, 2007. Flynn makes three arguments on appeal: (1) the Commission erred in requiring her to prove the causation of her injury with objective evidence in direct contravention of *Stephens Truck Lines v. Millican*;[2] (2) the Commission erred in arbitrarily disregarding the medical opinion of Flynn's neurologist, Dr. Paul Tucker, and therefore denying Flynn compensability, additional medical care, additional temporary-total-disability benefits, and attorney's fees to <sub>|2</sub>which she is entitled; and (3) the Commission erred in not articulating any reason for denying Flynn additional temporary-total-disability benefits not only as a result of her neck and arm injury, but also as a result of her foot injury in direct contradiction of *Arkansas Pub. Serv. Comm'n v. Continental Tel. Co.*[3] We affirm.

1. See *Flynn v. Southwest Catering Co.*, 2009 Ark. App. 641, 2009 WL 3153335.

2. 58 Ark.App. 275, 950 S.W.2d 472 (1997).

3. 262 Ark. 821, 561 S.W.2d 645 (1978).

Flynn was working as a waitress for appellee Southwest Catering on December 16, 2006, when she tripped over a mat, caught herself with her arms to keep from falling, and felt acute pain in her foot. Initial medical records showed that Flynn complained of right-foot pain. There was nothing in the records to suggest that Flynn sustained neck and arm trauma. Flynn was assessed as having a right-foot sprain. Southwest Catering accepted the injury as compensable and provided reasonably necessary medical treatment in connection with Flynn's compensable right-foot injury. Flynn subsequently filed a claim for benefits alleging that she suffered compensable injuries to her neck and arms. Southwest Catering controverted Flynn's claim for benefits for her neck and arm injuries in its entirety.

At the hearing held on December 7, 2007, Flynn testified that she went home after her injury and that the next day she could not walk. Flynn stated that she sought medical attention at St. Joseph's Business Health Clinic on December 18, 2006. She was seen by Dallas Pomeroy, nurse practitioner, and was diagnosed with a right-foot sprain. Flynn received a prescription for Naproxen and a foot brace, and was placed on restricted work duty. According to Flynn, her foot was hurting so bad on December 18, 2006, that she "didn't even notice the arms all that bad." She also stated that on the night of December 18, 2006, it felt as if something had hit her in the back of her head. She said that she "got a washcloth real hot, and . . . put it right . . . at the back of [her] ne[ck]." Flynn testified that the pain felt like a knife was cutting her. Flynn followed up at the clinic on December 27, 2006. She testified that she mentioned her arm pain to Pomeroy at that time.[4]

Flynn stated that Pomeroy prescribed muscle relaxers for her arms and sent her to physical therapy for her foot. Flynn followed up with Pomeroy on January 9, 2007. On January 17, 2007, Flynn was seen by Dr. Michael K. Atta. At this visit, Flynn received a refill of Naproxen, and was continued on her current work restriction. Flynn testified that she continuously complained about her arms to Dr. Atta. She also stated that she complained to her physical therapists, and as a result, they "repeatedly applied heating pads to [her] arms and shoulders the last several times [she] was in there." Flynn said that she did not know how the treatments to her arms and shoulders were billed, but that she was sure that she never paid for them. She also said that workers' compensation paid for the muscle relaxers Pomeroy prescribed her. Flynn testified that when she completed physical therapy, she complained to Dr. Atta about her arms and shoulders, and he made an appointment for her to see Dr. Tucker. According to Flynn, the first time Dr. Tucker saw her, he saw a "knot" on her arm. She said that she later had an MRI of her neck, and that Dr. Tucker opined that the problems with her arms and shoulders were "coming from" her neck. Flynn stated that her left arm was worse than her right arm, but that both gave her problems. Flynn said that due to the problems with her arms, it takes longer for her to get dressed. She also said that completing chores is a hassle. Flynn testified that prior to her December 16, 2006 injury, her arms never bothered her. At the hearing Flynn stated that her foot was much better, and that she would not complain about it. However, she stated that she wanted her arms to get to a point where she could return to work.

---

4. However, the progress note for that date makes no mention of any arm pain experi-

enced by Flynn.

On cross-examination Flynn stated that she was certain that she told Pomeroy about the problems with her shoulder, neck, and arms on December 27, 2006. According to Flynn, Pomeroy prescribed muscle relaxers for her pain. Flynn testified that she did not remember Pomeroy or Dr. Atta telling her that she could return to work on January 17, 2007. She further said, "I don't think [Dr. Atta] was paying enough attention to what I was telling him about my arms." Flynn stated that although she wanted to go back to her job, there was "no way that [she] could use [her] arms that much to return to that job now."

On re-direct Flynn said that she was not physically able to return to her job at the time of the hearing. She specifically stated that she could not use her arms "that much." She testified, "I used to be a fast little girl, or woman, or whatever. Used to have good reflexes and worked hard and fast. I see a job I wanted to get done and I got it done. I wasn't slow with things."

Flynn denied falling or being involved in a car accident after her December 16, 2006 injury. She stated that she is very careful not to get into "any more accidents." Flynn said that she has problems with both of her arms.

Flynn's medical records were also admitted into evidence at the hearing. The records submitted from St. Joseph's Business Health Clinic indicated that Flynn was initially seen on December 18, 2006, and was diagnosed with a foot sprain. She was placed on restricted work duty, prescribed an AFO and Naproxen, and told to follow up the following week. At Flynn's December 27, 2006 follow-up visit, she was sent to physical therapy, and was continued on restricted work duty. The notes for that date indicate that Flynn informed Pomeroy that there was no limited duty at her job, and that she had been off work since the date of her injury. Flynn followed up on January 9, 2007, and everything remained the same. Flynn was seen by Dr. Atta at her January 17, 2007 follow-up visit. Flynn's restrictions remained the same, and she received a refill prescription for Naproxen. The record for this date indicated that Flynn had three more physical therapy sessions. On January 25, 2007, Dr. Atta's clinic note stated that Flynn had a right-foot sprain with an obvious right-foot drop. Flynn was sent to physical therapy for another week, and her work restrictions remained the same. Dr. Atta also indicated that Flynn should have a nerve-conduction velocity test to "further evaluate her current conditions."

Flynn's nerve-conductivity study was performed by Dr. Tucker on February 6, 2007. Dr. Tucker's impression was that Flynn's peroneal nerve was abnormal with delayed conduction. Flynn returned to Dr. Atta on February 12, 2007. Dr. Atta's notes indicated that Flynn should see a neurologist to further "evaluate the probable cause of the [peroneal] nerve palsy to ascertain whether it is due or linked to her foot sprain in any way or not." Flynn was seen by Dr. Tucker on April 2, 2007. He opined that Flynn's right-foot drop had almost cleared up, and that she walked without any assistive device. Dr. Tucker's note from his examination of Flynn indicated that she had a small lump on her left arm, which he associated with Flynn's catching herself on December 16, 2006, when she almost fell. Dr. Tucker recommended an MRI of Flynn's cervical spine and lumbar spine. He also indicated that some of the weakness Flynn was experiencing was atypical.

Flynn was seen by Dr. Atta on May 24, 2007. According to Dr. Atta's notes, Flynn had gained strength in her ankle and was "no longer walking with a stepish gait." However, he indicated that she complained of "severe pain in the lateral aspects of her arms." Flynn told Dr. Atta

that she had been experiencing pain in both of her arms since a week after her December 16, 2006 injury. Flynn was assessed with resolving right-foot sprain and bilateral arm pain.[5] Dr. Atta opined that an MRI was warranted, and he continued Flynn on her current restrictions until her MRI was performed.

Dr. Steven A. Kulik performed an independent medical exam of Flynn on May 30, 2007. He opined the Flynn could "go back to work from the standpoint of her foot." He indicated in his report that Flynn had complaints of pain in her upper extremities; however, he did not fully evaluate her. Dr. Kulik agreed that Flynn should undergo an MRI of her neck.

An MRI of Flynn's cervical spine was performed on August 7, 2007. The impression was mild bilateral neural foraminal narrowing at C4–C5 and moderate bilateral neural foraminal narrowing at C5–C6,[6] greater on the right than the left. Dr. Atta's clinic note for August 8, 2007, stated that Flynn suffered from degenerative joint disease of the cervical spine. He suggested that since the MRI was initially requested by Dr. Tucker, Dr. Tucker should have a chance to evaluate it. Dr. Atta indicated that "the objective findings do not clearly correlate with any traumatic injury from falling onto her upper extremities. Based on this MRI report I am therefore not able to show any objective findings to further justify linking her current symptoms to the injury which occurred on December 16, 2006." Dr. Atta opined that there was nothing further "required from an occupational health point of view."

Flynn also introduced the notes from her physical therapy. The therapy progress notes indicated that the therapist treated Flynn's left shoulder on January 24, 2007, and February 2, 2007.

The administrative law judge (ALJ) found that Flynn proved compensable neck and arm injuries; that she was entitled to temporary-total-disability benefits from June 17, 2007, to a date to be determined; and that Flynn's attorney was entitled to the maximum statutory fee. The Commission reversed the ALJ and found that Flynn failed to prove a compensable injury to her neck or arms. Flynn appealed, and we remanded this case back so that the Commission could make a determination of whether Flynn was entitled to temporary-total-disability (TTD) benefits for her foot injury beyond June 16, 2007.[7] On remand, the Commission found that Flynn was not entitled to additional TTD benefits for her compensable foot injury. This appeal followed.

In reviewing decisions from the Workers' Compensation Commission, we view the evidence and all reasonable inferences deducible therefrom in the light most favorable to the Commission's findings, and we affirm if the decision is supported by substantial evidence.[8] Substantial evidence exists if reasonable minds could reach the Commission's conclusion.[9] When a claim is denied because the claimant has failed to show an entitlement to compensation by a preponderance of the evidence, the substantial-evidence standard of review requires us to affirm if the Commission's opinion displays a substantial basis for the denial of relief.[10]

On appeal, Flynn argues that the Commission required her to prove the cau-

---

5. A neurovascular examination of Flynn's upper extremities was normal.

6. The written findings of the MRI suggest it is at C6–C7.

7. See Flynn, supra.

8. Foster v. Express Personnel Servs., 93 Ark. App. 496, 222 S.W.3d 218 (2006).

9. Jivan v. Economy Inn & Suites, 370 Ark. 414, 260 S.W.3d 281 (2007).

10. Whitlach v. Southland Land & Dev., 84 Ark.App. 399, 141 S.W.3d 916 (2004).

sation of her injury with objective evidence. However, a review of the record does not reveal such a requirement. In order to prove a compensable injury, Flynn had to prove that there was an objective medical finding of injury and that there was a causal relationship between her employment and the injury.[11] There was an objective finding that Flynn suffered from peroneal nerve palsy. The discovery of the small lump on Flynn's left arm was also an objective finding. Whether there was a causal connection between Flynn's injury and her ⌊9employment was a question of fact for the Commission to determine.[12] Objective medical evidence is not essential to establishing the causal relationship between the injury and the work-related accident where objective medical evidence establishes the existence and extent of the injury and a preponderance of other nonmedical evidence establishes a causal relationship between the injury and the work-related accident.[13] Proof of causation in workers' compensation cases does not require medical certainty.[14]

■ In this case, although Flynn was seen on a weekly basis following her December 16, 2006 injury, there was no document showing that Flynn complained of neck, arm, and/or shoulder problems to any of her treating physicians until April 2, 2007. This was nearly four months after Flynn's work incident. The physical therapy notes show that Flynn received some type of treatment in therapy on her left shoulder on January 24 and February 2, but Flynn saw Dr. Atta on January 25 and February 12 for follow-ups, and the notes from those dates have no indication that she was experiencing any pain other than that associated with her right foot. Flynn testified that she did inform both Pomeroy and Dr. Atta about the pain in her upper extremities and her neck; however, the Commission was not required to believe this. It is the function of the Commission to determine the credibility of witnesses and the ⌊10weight to be given their testimony.[15] Here substantial evidence supports the Commission's finding that Flynn failed to prove she sustained compensable injuries to her neck and arms on December 16, 2006. Accordingly, we affirm.

Next Flynn argues that the Commission erred by arbitrarily disregarding the medical evidence of Dr. Tucker, a neurologist. We disagree. The Commission discussed Dr. Tucker's medical opinion; however, it placed more weight on Dr. Atta's finding of degenerative joint disease. When the Commission weighs medical evidence and the evidence is conflicting, its resolution is a question of fact for the Commission.[16] Moreover, the Commission can reject or accept medical evidence and determine the probative value to assign to medical testimony.[17]

Finally, Flynn argues that the Commission erred by not articulating a reason for denying her TTD benefits for her foot beyond June 16, 2007.[18] Substantial evi-

11. *Stutzman v. Baxter Healthcare Corp.*, 99 Ark.App. 19, 256 S.W.3d 524 (2007).

12. *Long v. Wal–Mart Stores, Inc.*, 98 Ark.App. 70, 250 S.W.3d 263 (2007).

13. *See Wal–Mart Stores, Inc. v. VanWagner*, 337 Ark. 443, 990 S.W.2d 522 (1999) (citing *Stephens Truck Lines v. Millican*, 58 Ark.App. 275, 950 S.W.2d 472 (1997)).

14. *Hubley v. Best Western–Governor's Inn*, 52 Ark.App. 226, 916 S.W.2d 143 (1996).

15. *Millican, supra.*

16. *Green Bay Packaging v. Bartlett*, 67 Ark. App. 332, 999 S.W.2d 695 (1999).

17. *Hamilton v. Gregory Trucking*, 90 Ark.App. 248, 205 S.W.3d 181 (2005).

18. She also includes her neck and arm injuries in this argument; however, we do not address TTD for those injuries having already concluded that the Commission's denial of

dence supports the Commission's decision to deny benefits after June 16. On April 2, 2007, Dr. Tucker opined that Flynn's right-foot drop was almost cleared up and noted that she was walking without any type of assistive device. On May 24, 2007, Dr. Atta noted that Flynn had gained strength in her ankle, and that she no longer walked with a gait. On May 30, 2007, Dr. Kulik [11]opined that Flynn could go back to work from the standpoint of her foot. The medical evidence suggests that Flynn had recovered from her compensable injury before June 16, 2007. Therefore, TTD benefits were not needed after that date.

Affirmed.

ABRAMSON and HENRY, JJ., agree.

benefits for those injuries is supported by substantial evidence.