Cite as 2026 Ark. App. 303

# ARKANSAS COURT OF APPEALS
## DIVISIONS II & III
### No. CV-25-111

| | |
|---|---|
| LASHEY HOPPING (FORMERLY ALMAGER)<br><br>APPELLANT<br><br>V.<br><br>TIMOTHY SCARBOROUGH, JR.<br>APPELLEE | Opinion Delivered May 13, 2026<br><br>APPEAL FROM THE BENTON COUNTY CIRCUIT COURT<br>[NO. 04DR-22-390]<br><br>HONORABLE XOLLIE DUNCAN, JUDGE<br><br>REVERSED AND REMANDED |

**CINDY GRACE THYER, Judge**

LaShey Hopping (formerly Amager) appeals two Benton County Circuit Court orders: one directing her to pay the attorney's fees of Timothy Scarborough, Jr., and one requiring her to pay an unequal amount of ad litem fees. She first challenges the award of attorney's fees, asking us to overrule *Tiner v. Tiner*, 2012 Ark. App. 483, 422 S.W.3d 178, and require the circuit court to provide a reviewable basis for attorney's-fee awards in domestic-relations cases. Alternatively, she also claims that the circuit court abused its discretion by requiring her to pay the entirety of Scarborough attorney's fees and costs. Finally, she asserts that the circuit court abused its discretion by ordering her to pay a majority of the ad litem fees. We agree the court abused its discretion in its award of ad

litem fees, and we agree that *Tiner* should be overruled; thus, we reverse and remand for reconsideration of these issues.

## I. *Factual and Procedural Background*

This matter involves a child-custody dispute over Hopping's and Scarborough's eight-year-old son (MC). The two were not married at the time of MC's birth in September 2016, but Scarborough did execute an acknowledgement of paternity shortly thereafter. The parties then lived together until MC was approximately four years old; thereafter, Hopping had sole custody of MC.

In March 2022, the Office of Child Support Enforcement (OCSE) filed a complaint for support against Scarborough. Scarborough answered the complaint and, shortly thereafter, filed a third-party complaint for paternity, custody, and visitation. In his third-party complaint, Scarborough claimed that an ex parte order of protection had been entered against him and that he had not had contact with MC in almost two years. He requested that the order of protection be modified and that he be awarded visitation.

Hopping responded, noting that the order of protection was a final order entered after a hearing in which Scarborough was present and had an opportunity to be heard. She argued that she should retain primary custody of MC and asked that any visitation awarded to Scarborough be supervised.

On October 7, Hopping and Scarborough entered into an agreed temporary order. The order established paternity in Scarborough and stated that Hopping would retain legal and physical custody of MC subject to Scarborough's right to supervised visitation. The order

stated that this arrangement would stay in place until MC's counsel or an attorney ad litem determines that Scarborough's visits could occur unsupervised.

On October 24, a temporary support order reflected that OCSE's "Support Complaint" had been set for a hearing on October 6, 2022, but that Scarborough and OCSE had reached an agreement on the issue of temporary child support. Other issues relating to OCSE's petition and the payment of child support, including retroactive support, were reserved for a final hearing on December 14, 2022.

On November 22, Hopping moved for the appointment of an attorney ad litem (AAL), and one was appointed a week later. The order appointing the AAL reflected that the parties had agreed to both the appointment of an AAL and the lawyer who would serve in that capacity. The custody and visitation matter was set for a final hearing on December 14. Before the hearing date, Hopping requested a continuance so the AAL would have sufficient time to complete her investigation. The court granted the motion, and the hearing was reset for April 17, 2023.

On December 9, 2022, Hopping's Legal Aid counsel moved to withdraw, claiming that Hopping was in violation of the client retainer agreement and that their relationship had become adverse and was irreparably damaged.[1] The court granted the motion to

[1]Hopping's first Legal Aid attorney changed employers, and a second attorney with Legal Aid assumed her representation on July 27, 2022. Then on November 22, 2022, a third Legal Aid attorney substituted as counsel, but no explanation was given for the substitution.

withdraw. Shortly thereafter, Hopping retained private counsel, who entered an appearance on January 26, 2023.

On April 11, Scarborough and the AAL filed a joint motion for a continuance. The AAL informed the court that she wished to evaluate MC's reaction to increased visitation with Scarborough before she made a complete recommendation and report to the court. Scarborough agreed with the AAL's request. The court granted the motion and reset the hearing for August 9.

On June 26, Scarborough filed an amended petition wherein he sought primary custody of MC. In the petition, he alleged that Hopping was restricting the activities he could engage in with MC during their visitations and interfered with his interactions with MC. In support of his request for custody, he relied on the AAL's recommendation that the frequency of his visits be increased and that supervised visits be relaxed. Hopping responded, generally denying that she had resisted increasing the frequency of Scarborough's visits and explaining that MC's illness had contributed to one missed visit.

On July 18, Hopping's counsel moved to withdraw, citing a breakdown in communications. The court granted the motion to withdraw, and Hopping's new counsel entered an appearance.

On July 31, Hopping and Scarborough filed a joint motion to continue the August 9 hearing to allow Hopping's new counsel to prepare.

On August 8, the court ordered the parties to mediate the issues of custody, visitation, and incidental matters related thereto. The order stated that the parties had agreed on a

4

mediator, and the mediation was scheduled to take place October 9. Mediation, however, did not occur as scheduled because Scarborough's grandmother became seriously ill and entered hospice in Texas.

On October 27, 2023, the parties entered into an agreed order allowing the removal of MC from Scarborough's insurance and placing him on Hopping's husband's insurance instead.

On December 8, Scarborough filed a second amended petition. He alleged that Hopping had made several unfounded DHS reports and was actively impeding his attempts to have a relationship with MC. He again asked for primary custody of MC. Hopping denied the allegations.

On December 11, Hopping filed a motion for emergency hearing and custody alleging Scarborough had abused MC. She claimed that this alleged abuse had resulted in MC's acting out. Because of MC's alleged disclosures, she involved law enforcement.

Scarborough responded, alleging that if MC had made such a disclosure, the disclosure was a product of Hopping's "intense psychological manipulation and emotional abuse of the child." He further claimed that Hopping was engaging in a "studied, deliberate and relentless campaign" of alienation and that she was engaging in vexatious litigation and abuse of the legal system.

A hearing was held on January 11, 2024, after which the court entered a temporary order granting Scarborough primary custody of MC with Hopping having supervised visitation. The court stated that there was a "genuine danger to the emotional and

psychological well-being" of MC if he were to stay in Hopping's custody. The court also ordered Hopping to undergo a comprehensive psychological evaluation and to pay for the costs associated with it.

A final hearing was held on October 17. At the conclusion of the hearing, the court announced its ruling, which was to maintain custody of MC in Scarborough with Hopping continuing to exercise only supervised visitation until she could "see her way clear to address these issues." Child support was to be based on the parties' affidavits of financial means. The court also granted Scarborough's counsel's request for permission to submit a petition for his fees and for an unequal division of AAL fees.

The following day, Scarborough's attorney filed a petition seeking an award of $12,585 in attorney's fees pursuant to Arkansas Code Annotated sections 9-10-109(a) and 9-27-342(d) (Repl. 2020) and *Davis v. Williamson*, 359 Ark. 33, 194 S.W.3d 197 (2004); and $461.70 in costs pursuant to Arkansas Rule of Civil Procedure 54(d)(2). Along with the affidavit in support of his petition, Scarborough's attorney attached a billing statement detailing the work he and another attorney in his firm performed in representing Scarborough, beginning with his defense of the OCSE complaint on April 26, 2022, and continuing through to the completion of the custody trial on the merits and drafting of the final order on October 18, 2024. He averred that the fees on the billing statement were fair and reasonable considering his experience as an attorney licensed in Arkansas since 1993; the complexity and novelty of the legal issues involved in this case; the amount of time

devoted to the case; and the fees customarily charged in this area by attorneys of similar skill and experience.

Hopping objected to paying Scarborough's attorney's fees for several reasons. She stated that the billing statement submitted by his attorney included work performed for Scarborough in responding to the OCSE complaint, which was at a time she was not even a party to the litigation. She also stated she could not afford payment of his fees and pointed to the gross disparity in the parties' incomes as reflected in their affidavits of financial means, and she claimed the litigation had been protracted due to Scarborough's refusal to discuss resolution of the matter short of trial. She ultimately asked the court to deny his motion and require the parties to pay their own attorney's fees.

On October 25, the ad litem filed a motion for payment of her fees. She attached a fee schedule showing 38.8 hours of work performed at $200 an hour for a total of $7,760 plus costs.[2] Scarborough responded to the motion, stating that the case should not have lasted for twenty-three months and that Hopping was at fault for the case lasting as long as it did. As such, he requested an unequal division of the fee amount. He argued that Hopping should be responsible for the $5,500 in AAL fees incurred since September 21, 2023, the date the AAL first corresponded with DHS regarding the allegations of abuse, and 50 percent of the remaining amount plus costs—or $6,133 (less the $500 retainer). Hopping objected to

---

[2]The AAL's fee schedule claimed $6 in costs for medical records. The parties each paid $500 to the AAL when the AAL was first appointed, leaving a balance of $6,766 in fees and costs at the end of the case.

paying "the lion's share" of the AAL fees and asked the court to first apply any funds that are available to cover the fees and then split the remainder equally between the parties.

On October 28, 2024, the court entered its order from the October 17 hearing. It incorporated the court's rulings from the bench, ordered Hopping to pay $267 a month in child support, and took under advisement Scarborough's and the AAL's fee requests.

On November 12, the court entered an order requiring Hopping to pay $5,000 of the $6,766 balance in AAL fees and costs and requiring Scarborough to pay the remaining $1,766. The court provided no reasoning for the imbalance and ordered Hopping to pay the $5,000 within thirty days of the order.

On November 18, the court entered an order granting Scarborough's petition for attorney's fees and costs in its entirety. In doing so, the court considered Scarborough's petition, its supporting affidavit and detailed billing, and Hopping's response thereto. The court further stated that it had considered the petition for attorney's fees and costs in light of the factors for determining a fee award set forth in *Chrisco v. Sun Industries, Inc.*, 304 Ark. 227, 800 S.W.2d 717 (1990), as modified for domestic-relations cases in *Davis*, *supra*. The court delayed payment of the $13,046.70 award until July 1, 2025, in light of the $5,000 AAL fee award previously entered. The court stated that, should Hopping fail to pay the sums as ordered, Scarborough could petition for a contempt finding and have the sums outstanding reduced to judgment.

Hopping has appealed, challenging both the circuit court's award of attorney's fees and costs and the unequal division of ad litem fees.

8

II. *Issues on Appeal*

A. Attorney's fees

The first question before us is whether the circuit court erred in its award of attorney's fees. Hopping argues that the circuit court erred in ordering her to pay the entirety of Scarborough attorney's fees. She also argues that the circuit court should be required to provide a reviewable basis for its attorney's-fees award. We agree, and to the extent that *Tiner v. Tiner*, 2012 Ark. App. 483, 422 S.W.3d 178, and its progeny suggest otherwise, we overrule them.

With respect to attorney's fees, Arkansas follows the American rule, which requires every litigant to bear his or her own attorney's fees, absent a state statute to the contrary. *Crain v. Crain*, 2025 Ark. App. 122, 708 S.W.3d 356 (citing *Millsap v. Lane*, 288 Ark. 439, 442, 706 S.W.2d 378, 379 (1986) (shareholder derivative action)); *see also Bailey v. Rahe*, 355 Ark. 560, 142 S.W.3d 634 (2004) (involving guardianship proceedings and Arkansas Code Annotated section 28-65-319's provision that an attorney's fee shall be allowed as an item of the expense of administration); *S. Beach Beverage Co. v. Harris Brands, Inc.*, 355 Ark. 347, 138 S.W.3d 102 (2003) (involving the Franchise Act and Arkansas Code Annotated section 4-72-208's provision that any franchisee who is harmed by violations of the Act shall be entitled to recover treble damages and, where appropriate, obtain injunctive relief in addition to reasonable attorney's fees and costs of litigation); *Lake View Sch. Dist. No. 25 of Phillips Cnty. v. Huckabee*, 351 Ark. 31, 91 S.W.3d 472 (2002) (involving the common-fund and common-benefit exceptions to the American Rule). Circuit courts also have the inherent power to

9

award attorney's fees in domestic-relations and contempt proceedings. *Johnson v. Johnson*, 2023 Ark. App. 464, 678 S.W.3d 418 (domestic relations); *Motal v. City of Little Rock*, 2024 Ark. App. 598, 703 S.W.3d 177 (contempt). Thus, in Arkansas, a circuit court's authority to award fees can be derived from two different sources: one, statutory; the other, inherent.

This distinction is of interest because our court in *Tiner* may have implied that the scope of and need for factual findings to support an attorney's-fee award is contingent on whether the court's authority to award those fees was statutory or inherent. Notwithstanding the implication, if it indeed exists, every decision awarding fees in a domestic-relations case, regardless of the basis on which the court is authorized to award it, should provide this court with findings sufficient to enable it to complete a meaningful review of the fee award. *See Scott v. Est. of Prendergast*, 90 Ark. App. 66, 204 S.W.3d 110 (2005). The order here does not do so; instead, it conclusorily states that the circuit court considered the *Chrisco* factors; the holding in *Davis*, 359 Ark. 33, 194 S.W.3d 197, which dealt with the financial disparity of the parties; and its award of ad litem fees before it awarded attorney's fees to Scarborough. It does not explain how the court's consideration of those factors resulted in the court's awarding Scarborough the entirety of his fees. Without such findings or reasoning, this court is unable to perform its judicially required task of determining whether the circuit court abused its discretion.

One of the fundamental purposes behind an award of fees is to place the burden of litigation expenses on the party who made it necessary. *See Liberty Mut. Ins. Co. v. Youngblood*, 2020 Ark. App. 398, 609 S.W.3d 468; *Ark. Game & Fish Comm'n v. Gerard*, 2018 Ark. 97,

541 S.W.3d 422 (citing *Cleek v. Great S. Metals*, 335 Ark. 342, 345, 981 S.W.2d 529, 530–31 (1998)). With that in mind, it is important to note that this case began as a child-support action filed by OCSE against Scarborough—an action to which Hopping was not yet a party. Even though Hopping became a party only *after* Scarborough filed a third-party complaint to establish paternity and visitation, the billing detail submitted by Scarborough and accepted by the court *in toto* includes fees incurred *before* Hopping's involvement in the case. Clearly, there is no evidence in the record that her actions necessitated the expenditure of fees for litigation when she was not yet a party. We further note that the court also ordered Hopping to pay Scarborough's attorneys' fees relating to the establishment of his child-support obligation (e.g., phone calls with counsel for OCSE, arriving at an agreed order regarding support calculations, and preparing for a hearing set to determine both current and retroactive child support.) The court also required Hopping to pay Scarborough's attorneys' fees during a time when the parties were in agreement concerning issues such as temporary custody and visitation, the appointment and selection of the AAL, and a continuance to allow the AAL time to evaluate MC's reaction to increased visitation with Scarborough. Thus, without an explanation by the court, we are unable to determine why Hopping was ordered to bear the entire expense of this litigation during a time when Hopping was not a party and when the parties were working cooperatively toward a resolution of the pending issues. Even if the court considered Hopping to be a party who was responsible for unnecessary litigation and expense, the record does not support the court's determination that Hopping should bear the entire expense of this litigation.

11

Furthermore, it is unclear how the circuit court's consideration of the financial abilities of the parties resulted in its award of fees. While the relative financial ability of each party is not determinative, the disparity in this case is significant. *See Goodson v. Bennett*, 2018 Ark. App. 444, 562 S.W.3d 847; *Beck v. Beck*, 2017 Ark. App. 311, 521 S.W.3d 543; *Jablonski v. Jablonski*, 71 Ark. App. 33, 25 S.W.3d 433 (2000) (in making a determination of a fee award and the amount thereof, the circuit court must consider the relative financial positions of the parties). Hopping's affidavit of financial means lists income, before expenses, as only $1,800,[3] while Scarborough's affidavit lists income more than four times that amount, or $7,515.08. Then, from Hopping's limited income, she will have to pay child support, visitation-supervision fees, and counseling expenses—on top of her living expenses. While Hopping was able to hire her own counsel, it is not known where she obtained the funds to do so or that she would have access to such funds to pay Scarborough's fees. To compound matters, the court ordered Hopping to pay $5,000 in AAL fees within thirty days and pay the attorney's-fee award of over $13,000 in less than eight months or risk a contempt finding. While the circuit court stated that it had considered the financial abilities of the parties, its rationale for placing such a large financial burden on the party least able to handle it is unclear.

---

[3]When awarding child support to Scarborough, the court imputed a monthly income to Hopping of $1,950.

12

Simply put, the court's order does not provide this court with any reasoning on which the court's fee award can be effectively evaluated. The financial disparity of the parties appears to actually militate *against* an award of fees as does the court's award of fees that were incurred before Hopping was added as a party—to say nothing of the time that the parties spent working cooperatively toward a conclusion of the action and before it became somewhat contentious. There very well may be a rational basis to support the court's conclusion, but without any explanation from the circuit court as to its reasoning behind the award of fees, we are unable to properly perform our appellate function of evaluating whether the court's award constituted an abuse of discretion. Consequently, in light of the record before us, we must reverse.

Accordingly, we reverse and remand for reconsideration of the issue of attorney's fees. Because we are remanding this issue to the circuit court for a reconsideration of the court's award of fees, we also take this opportunity to revisit our decision in *Tiner* and to provide some guidance for the court's consideration on remand.

First, we reiterate that there is not an exhaustive list of factors the court must consider or expressly rule on in evaluating fee awards in domestic-relations cases. Domestic-relations cases can vary widely in the variety, type, and complexity of issues involved and the contentiousness of the parties; thus, there can be no fixed formula for determining what constitutes a reasonable amount of attorney's fees. What is clear is that the circuit court must consider the relative financial position of the parties. *Beck*, *supra*; *Jablonski*, *supra*. Depending

on the facts of each case, the court may also consider the *Chrisco*[4] or *Chrisco*-like[5] factors, who is the prevailing party, and whether a party has acted contemptuously.[6] Additionally, the court should consider whether the actions of one or both parties contributed unnecessarily to the complexity of the case since one of the fundamental purposes behind an award of fees is to place the burden of litigation expenses upon the party that made it necessary. *See Youngblood*, 2020 Ark. App. 398, 609 S.W.3d 468; *Gerard*, 2018 Ark. 97, 541 S.W.3d 422 (citing *Cleek*, 335 Ark. at 345, 981 S.W.2d at 530–31).

An exhaustive hearing on the issue of fees or strict documentation of the time involved and expenses incurred in the prosecution or defense of a domestic-relations action may not be required. *Paulson v. Paulson*, 8 Ark. App. 306, 652 S.W.2d 46 (1983) (stating that an exhaustive hearing is not required on the amount of attorney's fees because the court has presided over the proceedings and gained familiarity with the case and the services rendered

---

[4]The *Chrisco* factors include the experience and ability of the attorney; the time and labor required to perform the legal service properly; the amount involved in the case and the results obtained; the novelty and difficulty of the issues involved; the fee customarily charged in the locality for similar legal services; whether the fee is fixed or contingent; the time limitations imposed on the client or by the circumstances; and the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

[5]These factors include the attorney's judgment, learning, ability, skill, experience, and professional standing; the relationship between the parties and the importance of the subject matter of the case; the nature, extent, and difficulty of services; and the research, anticipation of defenses, and means of meeting them. *Goodson*, 2018 Ark. App. 444, 562 S.W.3d 847.

[6]*See Frazier v. Bland*, 2024 Ark. App. 495, 700 S.W.3d 476; *James v. Walchli*, 2015 Ark. App. 562, 472 S.W.3d 504.

14

by the attorney); *Deaton v. Deaton*, 11 Ark. App. 165, 668 S.W.2d 49 (1984) (noting that strict documentation of time and expense is not required in a divorce case where the circuit court has had the opportunity to observe the parties, their level of cooperation, and their obedience to court orders.) Due to the circuit court's intimate acquaintance with the record and the quality of service rendered, we recognize the superior perspective of the circuit court in assessing the applicable factors. *Frazier*, 2024 Ark. App. 495, 700 S.W.3d 476. We simply require that the circuit court provide us findings or reasoning for its decision to award fees so that we may conduct a meaningful review.

Finally, as a reviewing court, our task is to review the record to determine whether the circuit court abused its discretion in its award of fees. If the record does not reflect the reasons justifying the circuit court's award of fees, it is insufficient. While we do not require the circuit court to make specific findings on every factor to be considered, we do require that it provide a record sufficient for us to make a meaningful and intelligent review in order to properly analyze the court's decision. To the extent our decision conflicts with *Tiner*, we overrule it.

### B. Attorney Ad Litem Fees

The final question before us is whether the circuit court erred in its award of attorney ad litem fees. There is a specific statutory scheme governing the appointment of attorneys ad litem and the payment of their fees and expenses. Arkansas Code Annotated section 9-13-101(e)(2) (Supp. 2023) states that a circuit court may appoint an AAL if doing so will facilitate a custody case and protect the rights of the child. For payment of the AAL's fees

15

and reimbursable expenses, the circuit court is required to send a copy of its fee order to the Administrative Office of the Courts (AOC), and those fees and expenses "*shall be paid by the AOC from funds appropriated for that purpose.*" *Id.* § 9-13-101(e)(4) and (e)(5)(A) (emphasis added). The circuit court may also require the parties to pay all or a portion of the ad litem *expenses*, depending on their ability to pay. *Id.* § 9-13-101(e)(5)(B).

The circuit court in this case failed to follow the foregoing statute in several respects. First, the circuit court failed to send a copy of its fee order to the AOC.[7] It also required Hopping to pay the AAL's fees, not her expenses, in contravention of the plain language of the statute. Even assuming that the General Assembly intended for the court to have the ability to order payment of the AAL's costs *and* fees, the court failed to first seek payment of AAL fees and costs from the AOC fund.[8]

Furthermore, and most critical to the issue on appeal here, even assuming the statutes permit the court to order the parties to pay all or a portion of the AAL fees, the circuit court's order was completely devoid of any consideration of Hopping's ability to pay—a clear requirement under the statute.

---

[7]We recognize that a failure to submit a copy of the order to the AOC is not, alone, a basis for reversal. *See Szwedo v. Cyrus*, 2019 Ark. App. 23, 570 S.W.3d 484 (AAL fee award upheld because court heard extensive testimony about the parties' ability to pay; absence of indication in the record that the court's order was not sent to the AOC was not fatal where appellant could not demonstrate prejudice).

[8]As with failure to submit the fee order to the AOC, failure of the party to first seek payment from the AOC is not, alone, a basis for reversal. See *Mathis v. Hickman*, 2024 Ark. App. 172, 687 S.W.3d 119 (holding that failure to first submit fee request to the AOC not reversible error without a showing of prejudice).

16

As noted above, Hopping's affidavit of financial means reflects an income of approximately $1,800 a month (before expenses) compared to Scarborough's approximate monthly income of $7,500 (before expenses). It further states that Hopping's monthly expenses—even before any award of child support, attorney's fees, supervised-visitation fees, or AAL fees—surpass her monthly income. Additionally, while Hopping did have multiple attorneys, she began this case with counsel from Legal Aid. Granted, she was later able to hire a private attorney and replace that attorney with another private attorney, but there is no evidence as to where she obtained the funds to pay those attorneys. Finally, the court also ordered Hopping to pay over $13,000 in Scarborough's fees yet provided us with no explanation as to why it believes Hopping has the income to pay those fees. In light of the foregoing, we conclude that the circuit court's failure to assess or make findings regarding the parties' abilities to pay constitutes an abuse of discretion; therefore, the attorney ad litem fees must also be reversed and remanded. *See Maddox v. Owens*, 2026 Ark. App. 126, ___ S.W.3d ___ (failure to determine guideline compliance or to assess or make findings with respect to the parties' ability to pay was an abuse of discretion).

Reversed and remanded.

ABRAMSON, VIRDEN, HIXSON, and MURPHY, JJ., agree.

GLADWIN, J., dissents.

**ROBERT J. GLADWIN, Judge, dissenting**. The majority holds that a circuit court must provide findings sufficient to enable this court to perform a meaningful review of fee awards in domestic-relations cases. Why? Because "[w]ithout such findings or reasoning, this court

17

is unable to perform its judicially required task of determining whether the circuit court abused its discretion."

Despite the circuit court's holding that it considered Scarborough's petition for attorney's fees—as well as his supporting affidavit and billing details—and the identified factors in *Chrisco v. Sun Industries, Inc.*, 304 Ark. 227, 800 S.W.2d 717 (1990), and *Davis v. Williamson*, 359 Ark. 33, 194 S.W.3d 197 (2004), the majority contends that the circuit court failed to provide a reviewable basis for the award. Considering that the circuit court went above and beyond what our appellate courts have required in domestic-relations matters for thirteen years, I must respectfully dissent. The majority has not, and cannot, demonstrate any error by the circuit court because it followed well-established precedent when it entered the order awarding Scarborough attorney's fees. Instead, the majority has chosen to ignore the longstanding presumption that the circuit court acted properly and made such necessary findings of fact to support its judgment, unless the contrary can be shown. *See, e.g., Curry v. Pope Cnty. Equalization Bd.*, 2011 Ark. 408, 385 S.W.3d 130.

Additionally, while the majority insists that the order awarding attorney's fees does not "provide this court with any reasoning upon which the court's fee award can be effectively evaluated," the majority does, in fact, evaluate—at length—the court's fee award. For example, the majority holds that

> we are unable to determine why Hopping was ordered to bear the entire expense of this litigation during a time when Hopping was not a party and when the parties were working cooperatively toward a resolution of the pending issues. Even if the court considered Hopping to be a party who was responsible for unnecessary litigation and

18

expense, the record does not support the court's determination that Hopping should bear the entire expense of this litigation.

The opinion goes on to state that "it is unclear how the circuit court's consideration of the financial abilities of the parties resulted in its award of fees" and acknowledges that while Hopping was able to afford counsel, "it is not known where she obtained the funds to do so or that she would have access to such funds to pay Scarborough's fees."

The majority has very clearly substituted its judgment for that of the circuit court. If, as the majority contends, the circuit court failed to "provide a record sufficient for us to make a meaningful and intelligent review," then the proper result is to reverse and remand the fee award for proper consideration of the factors. *See Stout v. Stout*, 2011 Ark. App. 201, 378 S.W.3d 844. However, here the majority's disposition of reversing and remanding "for a reconsideration of the court's award of fees" is futile considering the majority's concurrent finding that the record "appears to actually militate against an award of fees."

Furthermore, on remand, the majority provides what it terms "guidance for the court's consideration" and reiterates that there is no exhaustive list of factors the circuit court must consider or rule on when awarding attorney's fees in domestic-relations cases. However, in the same paragraph, the majority goes on to discuss factors that the parties "must" consider, "should" consider, and various factors the circuit court "may" consider. If at this point our circuit courts are pondering what exactly is enough to justify an award of attorney's fees in domestic-relations cases, they are not alone; I, too, am perplexed.

19

To complicate things further, while the majority acknowledges that financial ability of each party is not determinative, it concludes that the circuit court's "rationale for placing such a large financial burden on the party least able to handle it is unclear." Specifically, the majority takes issue with the significant financial disparity between Hopping and Scarborough as well as the uncertainty that Hopping "would have access to such funds to pay Scarborough's fees." Today, the majority has required far more than a consideration of the parties' financial positions and instead has held that the circuit court somehow failed to clearly state its rationale for awarding such fees—considering Hopping's limited income. The question for circuit courts to battle now becomes: what constitutes a sufficient consideration of the financial abilities of the parties?

Moreover, are we now demanding that before awarding attorney's fees, a circuit court must first ensure that both parties can afford the other's respective fees? What if one party heavily contributed to the complexity of the case, and that party's lack of cooperation caused another to incur significant legal fees? Rather than providing the circuit court "guidance" on remand—as the majority asserts—the plain language of the opinion clearly assigns the most weight to the financial ability of each party in making an award of attorney's fees.

However, disparity in income should not grant one party the opportunity to "manipulate the system" as the circuit court described Hopping's actions during this litigation. Here, the record reflects that Hopping filed no fewer than three false reports with the Arkansas Department of Human Services (DHS) alleging abuse or neglect, and the circuit court noted that each time Hopping did not get what she wanted, the allegations to DHS

20

got worse and ultimately became "atrocious." At one hearing, the circuit court referred to Hopping's actions as "diabolical" and asserted that she was "manipulating the system to destroy Mr. Scarborough's willingness to continue fighting in order to see his son." Notably, the circuit court's characterization of the litigation and actions of Hopping are starkly different from the majority's description of the parties "working cooperatively toward a conclusion" before it became "somewhat contentious."

In conclusion, the majority opinion does not recognize the superior perspective of the circuit court, nor does it credit the circuit court's opportunity to observe the parties, their level of cooperation, and their obedience—or lack thereof—to court orders over the course of twenty-three months. Because the majority has substituted its judgment for that of the circuit court and has inevitably created confusion as to what exactly constitutes a "reviewable basis" for attorney's-fee awards, I dissent. Because Hopping failed to demonstrate how the circuit court abused its discretion, I would affirm.

*Graves Law Firm*, by: *Josie N. Graves*, for appellant.

*Tara Ann Putnam*, for appellee.